IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
PITTSBURGH DIVISION

| | | |
|---|---|---|
| EQT CORPORATION, | | |
| | Plaintiff, | |
| v. | | Civil Action No. 2:25-cv-00832 |
| ROBERT R. WINGO, | | |
| | Defendant. | |

# COMPLAINT

Plaintiff EQT Corporation ("EQT") files this Complaint against Robert R. Wingo ("Wingo") and upon information and belief, states as follows:

## NATURE OF THE ACTION

1. Wingo currently serves as Executive Vice President, Corporate Ventures & Midstream at EQT Corporation.

2. Wingo's role places him within EQT's most senior management. EQT has trusted Wingo with trade secrets and other confidential business information.

3. In November 2021, Wingo and EQT entered into a contract that provided for Wingo's participation in EQT's Executive Severance Plan (the "Plan"). A true and correct copy of the Notice of Participation and Plan is attached hereto as Exhibit A. As a condition of his entry into the Plan, Wingo accepted certain covenants, including a covenant not to compete.

4. On May 30, 2025, Wingo voluntarily resigned and informed EQT that he would soon depart for a new position at one of EQT's direct competitors, The Williams Companies ("Williams").

5. Wingo's employment with Williams is a direct violation of his covenant not to compete.

6. Accordingly, EQT seeks declaratory and injunctive relief to (a) stop Wingo from breaching his non-competition obligations; (b) enjoin Wingo from engaging in unfair competition with EQT; (c) enjoin the improper disclosure and/or use of EQT's confidential and proprietary information; and (d) require future assurances from Wingo that he is complying and will continue to comply with his legal obligations to EQT going forward.

7. In addition to immediate injunctive relief, EQT further seeks compensatory damages, attorneys' fees, costs, interest, and all other appropriate relief to which EQT may be entitled.

## PARTIES

8. Plaintiff EQT Corporation is a Pennsylvania corporation headquartered at 625 Liberty Avenue, Suite 1700, Pittsburgh, Pennsylvania, 15222.

9. Defendant Wingo is a natural person and citizen of Texas. He resides at 208 Ivy Lane, San Antonio, Texas 78209.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because (i) EQT and Wingo are citizens of different States, and (ii) the amount in controversy exceeds $75,000, exclusive of interest and costs. 28 U.S.C. § 1332(a).

11. This Court has personal jurisdiction over Wingo (i) because Wingo agreed to submit to the jurisdiction and venue of this Court pursuant to § 9.6 of the Plan, (ii) because he has regularly traveled to Pennsylvania to conduct business as part of his employment with EQT, and (iii) because much of the transactions, occurrences, and confidential information that Wingo undertook to refrain from competing against and protect occurred or lie within Pennsylvania.

12. Venue is proper in the United States District Court for the Western District of Pennsylvania pursuant to 28 U.S.C. § 1391 because (i) Wingo agreed that such venue is proper for "any action to enforce" and "any action relating to [or] arising out of" the Plan, (ii) a substantial part of the events or omissions giving rise to the claims contained *infra* occurred in this district, and (iii) Wingo is subject to the personal jurisdiction of this Court.

## FACTS

### I. The Nature of EQT and Williams's Businesses

13. EQT is a vertically integrated energy company that focuses on the production, marketing, gathering, and transmission of natural gas sourced from the Appalachia Basin. More specifically, EQT produces and transports natural gas from the Marcellus and Utica shales within Pennsylvania, Ohio, and West Virginia. As of the year ended December 31, 2024, EQT produced approximately two trillion cubic feet of gas annually and held more than 24 trillion cubic feet of natural gas in proved reserves.

14. EQT's operations include both "upstream" and "midstream" activities. "Upstream" includes geologic exploration, drilling, and recovery of resources. "Midstream" includes the transportation, storage, and processing of recovered resources.

15. EQT's midstream activities rely on investment in gas gathering infrastructure and pipelines. EQT invests hundreds of millions of dollars annually in the acquisition, construction, and maintenance of gas infrastructure and pipelines. EQT treats its plans for future capital investment in pipelines in the Appalachian Basin as highly sensitive because disclosure of that information could impact competitors' activities in the midstream marketplace.

16. Midstream is a large part of EQT's overall business. As of the year ended December 31, 2024, EQT's gas gathering system included more than 1,975 miles of gas gathering lines as well as 179 gas compression units with 623,000 aggregate horsepower. EQT's interstate

gas transmission system included 950 miles of pipeline with throughput capacity of approximately 5 billion cubic feet daily.

17. EQT uses its midstream assets to both transport its own upstream production and to earn revenue through the provision of midstream services to other energy companies. As of February 2025, EQT anticipated earning more than $500 million in annual revenue from the provision of midstream services to third parties.

18. The importance of midstream to EQT's business increased after EQT committed approximately $6 billion in total consideration to the purchase of Equitrans Midstream Corporation ("Equitrans") in a transaction that closed in July 2024.

19. Through its acquisition of Equitrans, EQT gained an interest in the Mountain Valley Pipeline, LLC ("MVP"), a 303-mile long, 42-inch diameter natural gas pipeline completed in summer 2024 at the cost of billions of dollars. MVP can carry approximately 2 billion cubic feet of natural gas per day from the Appalachian Basin to Virginia. An extension of MVP, MVP Southgate, is pending amendment at the Federal Energy Regulatory Commission ("FERC") and would extend EQT's investment in the interstate pipeline system to North Carolina. These strategic investments open new markets to EQT's and other Appalachian Basin producers' lower carbon natural gas.

20. Williams is an energy company. While Williams's business is less focused on upstream activity, Williams provides significant midstream energy services to third-parties. Williams owns partial or complete interests in thousands of miles of oil and gas pipelines, including pipelines within the Appalachian Basin, specifically Pennsylvania, Ohio, and West Virginia.

21. Williams's activities in Pennsylvania, Ohio, and West Virginia constitute very important parts of Williams's business. In the year ended December 31, 2024, Williams reported more than $2 billion in revenue from its "Northeast Gathering and Processing" business segment concentrated on these areas. Williams is thus a large competitor of EQT's for the provision of midstream energy services in Pennsylvania, Ohio, and West Virginia.

22. Williams also owns the Transco Pipeline, a vast pipeline network extending from Texas to New Jersey. The Transco Pipeline passes through Virginia and North Carolina and therefore directly competes with EQT's investment in MVP and will compete with EQT's planned investment in MVP Southgate.

23. Williams is among EQT's largest actual or anticipated competitors in the market for the provision of midstream energy services in Pennsylvania, Ohio, West Virginia, Virginia, and North Carolina.

## II.  Wingo's Relationship with EQT

24. Robert R. Wingo joined Rice Energy Inc. ("Rice") in 2013 and was a senior vice president of midstream and marketing for Rice, as well as chief operating officer and a member of the board of directors for Rice Midstream Partners LP ("Rice Midstream") until their acquisition by EQT in November 2017.

25. In 2017 EQT acquired Rice, Rice Midstream, and their affiliates via a merger.

26. Following the closing of the merger, Wingo became a managing director at a midstream-focused venture capital and private equity investment fund.

27. In 2021, EQT hired Wingo to serve as an executive officer. Presently, Wingo serves as EQT's Executive Vice President, Corporate Ventures and Midstream, one of the most senior executive roles at EQT, a position to which he was promoted in 2024 after having served as Executive Vice President, Corporate Ventures.

28. In Wingo's role, he is the Executive point person leading both (i) EQT's plans to identify and develop new business ventures across the country and (ii) EQT's integration and development of a peer-leading midstream business, including its strategic growth. Given the seniority of his position, Wingo also has access to virtually every strategic undertaking and future initiative at EQT. He routinely developed and had access to EQT's most confidential and competitively sensitive information and plans and participated in strategic meetings to act on this information on behalf of EQT and in competition with competitors such as Williams.

29. Wingo also oversaw EQT's acquisition of Equitrans and was involved in considering numerous other strategic business combinations and merger and acquisition projects.

30. During his time at EQT, Wingo had unfettered access to critical EQT confidential information including the Company's most sensitive trade secrets, strategic business initiatives and opportunities, competitive strategies, and plans for growth and development.

31. Wingo directed the design of EQT's Midstream Department, including, but not limited to, all sub-department and personnel structures, business processes, opportunities, and information sharing and restriction.

32. Wingo was also EQT's designated representative on the management and governance boards for each of its midstream joint ventures and new venture investments including, for example, MVP Pipeline. As a result, Wingo has intimate knowledge of EQT's midstream business, including its trade secrets, customer relationships, cost structure, pricing, and strategic plans, as well as its investment and marketing activities related to the MVP Pipeline and Southgate Extension.

33. EQT has paid Wingo millions of dollars in compensation and other benefits during his employment with EQT.

34. In 2021 EQT offered Wingo the opportunity to participate in the Plan. The Plan offered Wingo certain employment assurances. For example, the Plan obligated EQT to pay Wingo significant remuneration if ever EQT terminated Wingo without cause. It also obligated EQT to accelerate Wingo's vesting in certain long-term compensation and provide him with benefits and significant cash payments, were he ever terminated following a change in EQT's corporate control. Such a change of control could happen at any time if, for example, another corporation acquired EQT.

35. In exchange for these significant benefits and assurances, the Plan required certain commitments from Wingo. These included non-disclosure and non-solicitation agreements.

36. The Plan also required Wingo to accept a non-competition covenant. Among other requirements, the Plan's non-competition covenant required Wingo to abstain for one year from employment where his duties would include "oversight of or actual involvement in providing services which are competitive with the services or products provided" by EQT. Specifically, until the one (1)-year anniversary following his resignation from employment with EQT, the covenant prohibits Wingo from:

> directly or indirectly, expressly or tacitly, for [yourself] or on behalf of any entity conducting business anywhere in the Restricted Territory . . . act in any capacity for any business in which [your] duties at or for such business include oversight of or actual involvement in providing services which are competitive with the services or products being provided or which are being produced or developed by the Company, or were under investigation by the Company within the last two (2) years prior to the end of [your] employment with the Company . . . or . . . become employed by such an entity in any capacity which would require [you] to carry out, in whole or in part, the duties [you] performed for the Company which are competitive with the services or products being provided or which are being produced or developed by the Company, or were under active investigation by the Company within the last two (2) years prior to the end of [your] employment with the Company.

*See* Plan, §8.2.1.

37. Wingo likewise agreed to protect EQT's confidential information and trade secrets, and not to

> directly or indirectly, disclose to or use, or knowingly permit to be so disclosed or used, for the benefit of yourself, any person, corporation or other entity other than the Company, (a) any information concerning any financial matters, employees of the Company, customer relationships, competitive status, supplier matters, internal organizational matters, current or future plans, or other business affairs of or relating to the Company, (b) any management, operational, trade, technical or other secrets or any other proprietary information or other data of the Company, or (c) any other information related to the Company which has not been published and is not generally known outside of the Company.

*See Id.*, §8.1.

38. Wingo also agreed for one year to abstain from recruiting investors (*id.*, §8.2.1(b)), customers (*id.*, §8.2.3), or employees (*id.*, §8.2.4) on behalf of entities competitive with EQT.

39. Wingo was advised, and agreed to the terms, of the Plan through a Participation Notice conveyed to him in October 2021. The Notice advised Wingo that his participation in the Plan and acceptance of its benefits, assurances, and obligations was optional. Wingo signed and agreed to the Notice and entered into the contract that provided for his participation in the Plan on November 3, 2021.

40. The Plan contains a Pittsburgh forum selection clause and a Pennsylvania choice of law provision that govern this action arising out of the Plan:

> This Plan shall be governed by and construed and interpreted in accordance with the laws of the Commonwealth of Pennsylvania without giving effect to its conflicts of law principles. Except to the extent that any dispute is required to be submitted to arbitration as set forth in Section 9.7 below, each Participant agrees that the exclusive forum for any action to enforce this Plan, as well as any action relating to our arising out of this Plan, shall be the state courts of Allegheny County, Pennsylvania or the United States District Court for the Western District of Pennsylvania, Pittsburgh Division. With respect to any such court action, each Participant hereby (a) irrevocably submits to the personal jurisdiction of such courts; (b) consents to service of process; (c) consents to venue; and (d) waives any other requirement (whether imposed by statute, rule of court, or otherwise) with respect to personal jurisdiction, service of process, or venue. Each Participant further

agrees that such courts are convenient forums for any dispute that may arise herefrom and that each Participant will not raise as a defense that such courts are not convenient forums.

*See Id.*, § 9.6.

### III. Wingo's Planned Departure to Williams

41.     On May 30, 2025, Wingo advised EQT of his resignation, which will be effective June 20, 2025.  Wingo further advised EQT that he had accepted a position an Executive Vice President within Williams's Corporate Strategic Development department, taking over a position previously held by Chad Zamarin.  That position would "oversee[] enterprise-level strategy, business development and customer-relationship management,"[1] among other duties, requires him to compete with EQT, and breaches the non-competition covenant.

42.     In his new position, Wingo anticipates that he will help direct and oversee Williams's midstream businesses and will therefore have a role with the same scope in the same business lines and in the same territories as his prior role at EQT.  On information and belief, Wingo's anticipated responsibilities include involvement in Williams's midstream businesses in the Appalachian Basin and the direction and oversight of strategic investments and initiatives in the Appalachian Basin.  Because of Wingo's new position and responsibilities, it is inevitable that he will disclose EQT's confidential information and trade secrets.

43.     Shortly after providing his resignation notice, EQT informed Wingo of his obligations under the Plan.  In addition to numerous prior conversations with Wingo about his post-employment obligations and specifically his non-competition agreement, on June 11, 2025, EQT sent Wingo a letter to remind him of his various obligations to EQT and copied Williams.  A true and correct copy of that letter is attached hereto as Exhibit B.  Among other things, the letter

---

[1] https://www.williams.com/leadership/chad-j-zamarin/.

reminded Wingo the Plan "prohibits [Wingo] from joining Williams as EVP, Corporate Strategic Development before the one (1)-year anniversary of [his] employment termination with EQT. [Wingo's] noncompete unequivocally precludes [his] stated intention to work at EQT's direct competitor, Williams." EQT has also advised Williams of Wingo's obligations both with a copy of such letter and in numerous phone conversations with its business and legal representatives. After his resignation notice but before its effective date, EQT took actions to reduce and eliminate Wingo's access to competitively sensitive information.

44. On information and belief, Wingo has decided to breach his non-competition covenant and accept a position with Williams effective July 14, 2025, less than a month following his last day with EQT on June 20, 2025.

## IV.    EQT is Entitled to Injunctive Relief

45. EQT is likely to succeed on the merits of its claims in this case because Wingo breached the valid and enforceable provisions of the Plan related to non-competition, and employment with Williams is likely to also breach his confidentiality and non-solicitation obligations. Since Wingo will lead and oversee Williams's midstream business and strategic investments, he will likely breach his commitment in the Plan not to disclose EQT's trade secrets and confidential information concerning these very subjects. Moreover, Wingo's broad customer relations and business development responsibilities at Williams make it likely that he will violate his agreement in the Plan not to recruit customers and investors on behalf of entities competitive with EQT, especially those in the midstream business.

46. If a preliminary injunction is not entered, EQT will be irreparably harmed through loss of its customer goodwill, market share, business opportunities, competitive advantage, confidential information, and relationships with customers, prospective customers, suppliers, and distribution partners.

47. EQT will suffer far greater harm if a preliminary injunction is not granted than Wingo will if he is required to adhere to the contractual obligations and promises he made to EQT in the Plan.

## COUNT I: DECLARATORY JUDGMENT

48. EQT incorporates the allegations of paragraphs 1 through 47 as though fully stated herein.

49. This Court may issue declaratory relief regarding the validity of the Plan and its nondisclosure, non-solicitation, and non-competition covenants pursuant to 28 U.S.C. §§ 2201 and 2202.

50. EQT requests that this Court issue an order affirming the validity of the Plan and Wingo's nondisclosure, non-solicitation, and non-competition covenants.

51. EQT further requests preliminary and permanent injunctive relief.

52. EQT is likely to succeed on the merits of this dispute regarding Wingo's shift in loyalty to Williams, because Wingo has admitted to imminent employment with Williams, and because Williams is plainly in significant competition with at least EQT's midstream businesses and investments, in which EQT understands Wingo intends to be significantly involved. As Zamarin's replacement at Williams, Wingo will, among other responsibilities, oversee strategy, development, and customer relationship management for Williams's midstream business.

53. EQT will be immediately and irreparably harmed once Wingo confers on Williams his knowledge of and experience with EQT's midstream operations, with EQT's midstream business relationships, and with EQT's plans for midstream investment and otherwise inevitably discloses EQT's confidential information and trade secrets.

54. EQT will be immediately and irreparably harmed once Wingo confers on Williams his knowledge of and experience with EQT's strategic investments and initiatives in new energies

11

ventures, with EQT's business and investor relationships in that space, and with EQT's plans for continued investment in new energies ventures and otherwise inevitably discloses EQT's confidential information and trade secrets.

55. Wingo agreed that any breach of his restrictive covenants would "result in immediate and irreparable harm to the Company," in an amount not "reasonably or adequately compensated by damages in an action at law" when he signed the contract containing the Plan. *See* Ex. A at 16.

56. The equities favor relief. Wingo would not be unduly burdened by compliance with the Plan, which does not unreasonably restrict his employment. For example, Wingo could accept employment with certain of the numerous energy companies focused on and operating within Wingo's home state of Texas without violating the Plan. The reasonableness of the Plan is further evidenced by the significant benefits conferred on Wingo by EQT in exchange for his faithful compliance with his obligations. Wingo further agreed when entering into the Plan that his restrictive covenants are "necessary for the protection of the legitimate business interests of [EQT]," and "are reasonable." *See* Ex. A at 16.

57. The public has an interest in the enforcement of the Plan. That's true because the public interest generally favors freedom of contract, and because such enforcement encourages commercial entities to pursue large-scale investment in interstate commerce, such as EQT's investment in the MVP Pipeline.

## COUNT II: BREACH AND ANTICIPATORY BREACH OF CONTRACT

58. EQT incorporates the allegations of paragraphs 1 through 47 as though fully stated herein.

59. The Plan is a valid and enforceable contract under the laws of the Commonwealth of Pennsylvania and is supported by adequate consideration.

60. Wingo has breached the Plan by becoming employed by Williams in a role that requires him to perform duties that he performed for EQT and to compete with at least EQT's midstream businesses and investments.

61. Wingo's resignation from EQT, and acceptance of an Executive Vice President position at Williams, manifest his absolute and unequivocal refusal to comply with his obligations under the Plan.

62. Wingo's breach and anticipated breach will cause EQT resultant damages, including but not limited to expenses incurred to protect EQT's confidential information and trade relationships, damages stemming from EQT's impaired competitive position following any disclosure of EQT's information, damages stemming from Williams's enhanced competitive position following its acquisition of Wingo's knowledge and abilities, the loss of Wingo's services as an employee, and expenses incurred to enforce EQT's rights under the Plan.

63. EQT accordingly requests that the Court award EQT compensatory damages to remediate Wingo's anticipatory breach and deter similar breaches.

64. In the Plan, Wingo agreed that "if the Company and any Participant become involved in a lawsuit regarding the enforcement of the Restrictive Covenants, the prevailing party will be entitled, in addition to any other remedy, to recover from such Participant its reasonable costs and attorneys' fees incurred." *See* Ex. A at 16.

## PRAYER

65. EQT requests preliminary and permanent injunctive relief that:

   a. Restrains Wingo from accepting employment with Williams for a period of one-year following the effective date of his resignation from EQT;

   b.  Further restrains Wingo for a period of one year following the effective date of his resignation from EQT from breaching the non-competition, non-solicitation, and non-disclosure provisions of the Plan.

66. EQT respectfully requests that the Court enter judgment on Counts One and Two, award EQT its reasonable expenses in enforcing the Plan, and further requests all other appropriate relief to which EQT may be entitled.

Date:  June 17, 2025      Respectfully submitted,


             */s/ John K. Gisleson*
             John K. Gisleson, PA 62511
             Matthew H. Sepp, PA 85406
             Steven N. Hunchuck, PA 327892
             MORGAN, LEWIS & BOCKIUS LLP
             One Oxford Centre
             Thirty-Second Floor
             Pittsburgh, PA  15219
             Telephone: (412) 560-3300
             Facsimile: (412) 560-7001
             john.gisleson@morganlewis.com
             matthew.sepp@morganlewis.com
             steven.hunchuck@morganlewis.com

             *Counsel for Plaintiff EQT Corporation*